THE LAKE SHORE ELECTRIC RY. CO. *v.* KELLAR.

(Decided July 2, 1928.)

*Messrs. King, Ramsey & Flynn,* for plaintiff in error.

*Mr. John F. McCrystal,* for defendant in error.

LLOYD, J.  The Lake Shore Electric Railway Company was the defendant, and Alfred J. Kellar was the plaintiff, in the court of common pleas, and will be so referred to here.

In the afternoon of February 7, 1925, the automobile of plaintiff was struck by an interurban car of defendant at a crossing in the village of Huron, known as the Berlin street crossing. Plaintiff sustained certain personal injuries, and his automobile, a 1923 model Ford touring car, was damaged beyond repair. In his petition, filed in the court of common pleas, plaintiff claimed that the defendant was negligent in certain alleged particulars, and that thereby he had sustained damage in the sum of $10,000, $250 of which was for the alleged damage to his automobile. The trial resulted in a verdict and judgment of $2,250 in favor of the plaintiff. The defendant seeks a reversal of this judgment.

The defendant denied that it was in any respect negligent, but relied principally on the alleged claim that the plaintiff was guilty of contributory negligence, and at the close of plaintiff's evidence interposed two motions, the first for a directed verdict in its behalf, the second requesting the court to direct a verdict in favor of defendant "with reference to the injuries and claim of the plaintiff for damage to his person, and that there be left to be submitted to the jury only such evidence as bears upon the question of damages sustained by the plaintiff on account of damage to his automobile." These motions, being overruled, were renewed at the completion of defendant's evidence, and were then again overruled, defendant preserving its exceptions thereto.

The question confronting this court for consideration is whether or not the plaintiff was himself guilty of such contributory negligence as precludes a right of recovery by him in any sum, or whether he may

recover only for the damage to his automobile. From the evidence it appears that the defendant owns and operates an interurban railway into and through the village of Huron, its track being constructed upon and along the northerly side of a main highway called the Lake road, which extends in an easterly and westerly direction, the central portion thereof being paved with concrete. Berlin street, also in Huron, extends in a general north and south direction to Lake road, where it is crossed by the track of defendant. About 4 feet and 7 inches northerly of the north rail of defendant's track is a line of poles, which plaintiff testified obstructed the view to the east of a person on Berlin street approaching the railway crossing. Easterly from the point of the collision the track of defendant is straight for a distance of 2,380 feet, where it curves to the northeast. Berlin street is unpaved, rough and "bumpy," with several holes therein, of which one, at the time of the occurrence in question, was seven or eight feet north of the railway track. The day before the occurrence employees of the defendant had dumped about a quarter of a carload of cinders on Berlin street, spreading them over the surface of the eight or ten feet thereof immediately north of the track, at an average depth of five or six inches, filling therewith the holes in that part of the street, so that the portion of the street so covered appeared to be even. Prior to the day of the collision the plaintiff had full knowledge of and was entirely familiar with all of the foregoing facts, except the placing of the cinders on Berlin street, having driven his automobile upon Berlin street and over this railway crossing many times previous thereto.

On the day in question accompanied by a Mr. Paxton he was driving in his Ford car southerly on Berlin street and "bumped along the road" until he came to the crossing. He says that when he "got right to the track pretty near the track," he "looked up and down * * * and couldn't see nothing coming. I * * * shut my car off and kind of drifted over a little, and hit those cinders and the engine stalled, just the wheels over the north rail." Plaintiff remained in the automobile trying to start it, and, he being unable to do so, Paxton got out to crank it. Paxton testified that before he got out Kellar "tried to start her several times—oh, I should judge four or five minutes, three or four minutes anyway, at the outside—and he see he couldn't start her that way. I got out of the car and I tried to crank the car, and see if I couldn't start it and I looked down the track—that is, to the east— and saw this car approaching. Well, at that time she was getting pretty close." On cross-examination Paxton said that, when "it failed to start, I got out and was going to crank it; that is, when I saw the car coming, I got out of the car to get a view of the track, to see whether there was any street car coming or not," and to crank the car. He says he thinks the Ford car was stalled on the track four or five minutes before being struck by the street car, and that the street car could be seen for a "good big half mile anyway, a clear view of it" east of the crossing.

Kellar, the plaintiff, says that, "when I tried to start it two or three times, and couldn't, I told him (Paxton) to get out and crank it, and we tried to crank it two or three times. When he got out he

started toward the front end of the car and hollowed, 'Here comes that car,' and I looked out of the window and seen the car coming, but I did not have time to get out of it. I looked out, but I did not have time to get out. I looked out and saw the car coming, just when he told me the car was coming.'' Again he says that ''Paxton got out and cranked the car,'' and that his auto was stalled on the track before the collision ''possibly two or three minutes,'' and that ''I started my car, tried to start it two or three times with the starter, and I guess through the excitement I got it flooded; the carburetor flooded; lots of times you get it so it floods the spark plugs so she won't go.''

Another witness called by plaintiff says that it was rather a bright day and the pavement was dry; that he was driving westerly on the Lake road and saw the Ford car ''approaching rather slowly, and it drove up onto the Lake Shore Electric tracks and there it stopped.'' Then ''I looked back to see if the electric car was coming, and I saw one just coming, rounding the curve at the east. As I got up almost to where the collision occurred, I looked back again. I then saw the motorman, * * * probably 200 or 300 feet from the crossing, apparently making a desperate effort to bring his car under control, to apply his brakes. As I had been driving up to the crossing, the one man got out of the machine and was around to the front of it, either attempting to crank it or push it off the tracks, and just before the collision he turned and ran down the road, passing to the north of the stalled automobile.'' He further says, ''I think I heard the car whistle blown as it came around the bend,'' and that the interurban

car stopped possibly 200 feet west of the place of collision.

Wilbert Henkleman, a civil engineer, called by plaintiff, stated that, standing at a point six feet north of the north rail of the track and looking easterly, the view is unobstructed for a distance of 650 feet, and that a person standing between the rails of the track had a clear view east to the curve in the track, which is 2,380 feet from Berlin street.

The testimony of the witnesses called by the defendant was in conflict with that offered by the plaintiff, in that their testimony tended to show that Kellar in his Ford car drove onto the crossing directly in front of the approaching interurban car. The motorman on the interurban car testified that he first saw plaintiff's automobile when about "four pole lengths," or 400 feet, from the crossing; that it was then just coming "up to the crossing, just come up and stopped." Thereupon he shut the power off, put the air on, reversed the motors, and blew the whistle. He stated that there was nothing further that could be done to stop the car, and there is no evidence disputing this statement. The speed of the car he says was about 35 miles an hour when he first noticed the Ford approaching the crossing, and no witness states the speed at any time to have been more than from 35 to 40 miles an hour. The conductor was standing in the middle of the car, and did not observe the Ford automobile on the track until after the motorman had sounded the danger signal, several short blasts with the whistle. He then looked ahead and saw the Ford at the crossing, about 200 or 300 feet distant. He as

well as other witnesses say that the motorman made every effort to stop.

If we accept as the truth the testimony of plaintiff and Paxton that they were upon the crossing from two to five minutes, without looking to see if an interurban car was approaching, and that they did absolutely nothing for their own protection or safety until it was too late, or if we accept the story of the motorman as correctly stating the fact that Kellar drove upon the track directly in front of the approaching car, then in either event it would seem that we must conclude that the plaintiff was guilty of such contributory negligence as precludes a recovery for any personal injuries he may have sustained. *D., T. & I. Rd. Co.* v. *Rohrs*, 114 Ohio St., 493, 151 N. E., 714; *Christiansen* v. *Lake Shore Electric Railway Co.*, 33 Court of Appeals Opinions, Sixth District, unreported, 182. In the case last cited motion to certify the record was overruled by the Supreme Court.

While his automobile was upon the track it was certainly the continuing duty of the plaintiff, who knew, as he testified, that a car might approach thereon at any time, to use his faculties of sight and hearing to avoid danger to himself. He could alight from the automobile, even though unable to move it, and, in our judgment, viewing most favorably the evidence produced in his behalf, his negligence continued to the time of the collision.

The petition of plaintiff alleges, and the undisputed evidence is, that the automobile of the plaintiff was damaged in the sum of $250. The verdict and judgment is for $2,250. The motion of the defendant, requesting the court to withdraw from the

jury the consideration of the question of damages for the injuries to the person of the plaintiff, should have been granted. There was nothing to submit to the jury, except the question whether or not the plaintiff was entitled to recover for damage done to his automobile, and there is sufficient evidence in the record to sustain a recovery for this element of damage.

The judgment of the court of common pleas will therefore be modified, and limited to $250, as of the date of the judgment, and, as modified, will be affirmed.

*Judgment modified and affirmed.*

RICHARDS, J., concurs.

WILLIAMS, J., dissenting. The writer regrets that he is unable to concur in the views held and expressed by the majority of the court.

As he understands the rules of law declared by the Supreme Court of Ohio, those rules require the conclusion that the question as to whether or not the plaintiff was entitled to recover for personal injuries was properly submitted to the jury by the court below, and this court cannot properly say, as a matter of law, that the right to recover for personal injuries was barred by the plaintiff's contributory negligence.

As the majority of the court sustains the verdict, so far as it covers the right of plaintiff to recover damages for the automobile destroyed, it would seem to follow that the majority entertains the view that the plaintiff was not guilty of negligence as a matter of law in going upon the track in the first

instance, or permitting his automobile to stall thereon, if he did; for, if he were guilty of contributory negligence as a matter of law in so doing, final judgment should be entered in this court for the plaintiff in error. This phase of the case involves the principle declared in *D., T. & I. Rd. Co.* v. *Rohrs,* 114 Ohio St., 493, 151 N. E., 714. In view of the conflict in the evidence, it seems certain that question was properly one for the jury.

The doctrine of last chance applies to this case. *Pennsylvania Co.* v. *Hart,* 101 Ohio St., 196, 128 N. E., 142. The motorman testified that he first saw plaintiff's automobile when it was going upon the track, and at that time the electric car was 400 feet from the crossing. There is also evidence tending to show that the motorman stopped the electric car in from 575 to 600 feet. There is also evidence in the case tending to show that the electric car was much more than 600 feet from the crossing when the automobile went upon the crossing. One witness, riding in an automobile along the road, testified that the electric car was then coming around the curve. The evidence upon the point as to where the electric car was at that time is very conflicting and presented an issue of fact for the determination of the jury.

It is axiomatic to say that, if the defendant was guilty of negligence in getting into a place of danger, and stalled upon the track, his negligence in that respect ceased when he got there; and as there was evidence tending to show that his negligence ceased long enough before the motorman actually saw the car stalled on the track to have enabled him to stop his car and prevent the collision, the action was properly submitted to the jury under the doctrine of

last chance, unless the plaintiff was guilty of contributory negligence as a matter of law in not getting off the track into a place of safety before the collision. In fact, the doctrine of last chance was applied as to plaintiff's right to recover for the automobile, and the majority of the court sustains his right to recover in that respect.

Upon this phase of the case we must remember that, when plaintiff's automobile stalled, he was confronted with an emergency and placed in sudden and unexpected peril. The rule applicable to such cases is stated in 20 Ruling Case Law, page 29, Section 22, from which we quote:

"It follows from what has been said that anything which operates to deprive a person of the ability to exercise his intellectual powers and guide his acts thereby will relieve him of an imputation of negligence, that otherwise might arise from his conduct. Emergencies or sudden perils illustrate this proposition. The rule judically stated is that one who in a sudden emergency acts according to his best judgment, or who, because of want of time in which to form a judgment, omits to act in the most judicious manner, is not chargeable with negligence."

A person who is confronted with an emergency is not thereby relieved of the duty to exercise ordinary care, but one who is driving an automobile, which stalls unexpectedly upon a railroad track, cannot be said to be guilty of contributory negligence as a matter of law, except in the most extreme cases. The facts in the case of *Buell, Admx.,* v. *New York Central Rd. Co.,* 114 Ohio St., 40, 150 N. E., 422, presented an extreme instance, as all the party

killed in that case would have had to do was to step back to a place of safety.

According to some of the evidence, the car was stalled upon the track a very short length of time. At 35 miles an hour the electric car would travel the 1,980 feet between the curve and a point 400 feet from the crossing in a little less than 30 seconds. The evidence upon the issue of contributory negligence of plaintiff in failing to get off the track involved a mixed question of law and fact, and was properly submitted to the jury.